**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **JUAN CASTRO,** | Case No. 1:19 CV 744 |
| Plaintiff, | Judge James Gwin |
| v. | Magistrate Judge James R. Knepp II |
| **COMMISSIONER OF SOCIAL SECURITY,** | |
| Defendant. | **REPORT AND RECOMMENDATION** |

### INTRODUCTION

Plaintiff Juan Castro ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter has been referred to the undersigned for preparation of a report and recommendation pursuant to Local Rule 72.2. (Non-document entry dated April 4, 2019). Following review, and for the reasons stated below, the undersigned recommends the decision of the Commissioner be affirmed.

### PROCEDURAL BACKGROUND

Plaintiff filed for SSI in October 2016, alleging a disability onset date of April 24, 2015. (Tr. 392-98). His claims were denied initially and upon reconsideration. (Tr. 342-46). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before an administrative law judge ("ALJ") on June 5, 2018. (Tr. 285-308). On October 16, 2018, the ALJ found Plaintiff not disabled in a written decision. (Tr. 136-49). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner.

(Tr. 1-6); *see* 20 C.F.R. §§ 416.1455, 416.1481. Plaintiff timely filed the instant action on April 4, 2019. (Doc. 1).

## FACTUAL BACKGROUND

Personal Background and Testimony

Born in February 1963, Plaintiff was 53 years old on his application date, and 55 years old at the time of the hearing. *See* Tr. 290, 392. He originally alleged disability due to a pituitary tumor, pituitary gland disorder, and a herniated disc. (Tr. 412).

Plaintiff had a GED and past work as a warehouse sorter. (Tr. 413). When asked about his work history, and medical records detailing "construction" work, Plaintiff replied that he did some painting in 2011 or 2012. *See* Tr. 291-92. He did not work in July 2017. (Tr. 292). Plaintiff testified that he stopped doing construction work in 2011 due to dizziness, fatigue and headaches. *Id*.

Plaintiff lived with relatives at the time of the hearing. (Tr. 290). He helped with housework such as cleaning bathroom sinks and mirrors, and preparing coffee. (Tr. 294). He "tr[ied] to keep busy" by walking and going to the store. (Tr. 293).

Plaintiff attended physical therapy and took medications for his back pain (though he did not remember what kind). (Tr. 294). He described ongoing back pain despite stretching and physical therapy. (Tr. 291).

Plaintiff had not received any mental health treatment, but took Wellbutrin and Trazadone – prescribed by his primary care physician – for depression and insomnia. (Tr. 295-96). Plaintiff testified it was hard for him to stay focused and he had mood changes; he lost jobs due to arguments with coworkers. (Tr. 296-97).

Plaintiff estimated he could stand for about 20 minutes before needing to lean on something, sit down, or rest due to leg weakness, swelling, and dizziness. (Tr. 300).

Plaintiff also attributed symptoms of headaches, dizziness, and fatigue to his tumor. (Tr. 298). He had fallen before as a result of feeling dizzy. *Id.* Finally, Plaintiff testified that some days he had double vision. (Tr. 301). Sunlight affected his vision and he had glasses to help block the sun. (Tr. 302). Plaintiff had a prescribed cane, but did not have it with him at the hearing; he used it to or three times per week for balance. (Tr. 298-99).

Relevant Medical Evidence

*Physical Health*

In 2013, Plaintiff underwent surgery for a pituitary macroadenoma. *See* Tr. 476.

In January 2015, he saw endocrinologist Robert Zimmerman, M.D. (Tr. 475-77). Plaintiff reported his vision was fine and he had occasional headaches. (Tr. 476). Dr. Zimmerman noted a recent MRI revealed a small residual tumor, but "[c]onsidering that his pituitary function is fine", recommended a follow-up MRI in one year. (Tr. 477).

Plaintiff returned in August, at which time he reported fatigue, headaches, and occasional dizziness, but no visual disturbances. (Tr. 470).

In December, Plaintiff saw primary care physician Kincade D. Turner, M.D., to establish care. (Tr. 544-48). Plaintiff reported neck pain and headaches daily or every other day. (Tr. 544). On examination, Dr. Turner noted Plaintiff's visual field was intact. (Tr. 546). Plaintiff had no musculoskeletal tenderness, a normal gait, normal range of motion in his hips, knees, shoulders, and spine, normal muscle strength, and normal reflexes and sensation. *Id.* Due to Plaintiff's headaches, Dr. Turner ordered an MRI; he also noted Plaintiff's symptoms were consistent with tension headaches. (Tr. 547).

In February 2016, Dr. Zimmerman reviewed the updated MRI, noting it showed an increase in tumor size since a January 2015 MRI. (Tr. 463). Plaintiff reported fatigue, malaise, and

pounding headaches, but no dizziness. (Tr. 464). Dr. Zimmerman assessed a pituitary macroadenoma increasing in size and planned a repeat MRI in six months. *Id.*

In August 2016, Dr. Zimmerman again noted Plaintiff's pituitary adenoma was increasing in size and referred him for evaluation with Dr. Recinos. (Tr. 457-59). At this visit, Plaintiff denied headaches, fatigue, malaise, and dizziness. (Tr. 458). His musculoskeletal and visual field examinations were normal. (Tr. 458-59).

Plaintiff went to the emergency room in November 2016 reporting headache, dizziness, and double vision. (Tr. 623-25). An MRI performed during this visit showed no significant change in the tumor. (Tr. 640). Notes state Plaintiff was a general contractor, was active at work, and walked and stretched for exercise. (Tr. 631). He ambulated independently (Tr. 625), and had normal musculoskeletal range of motion, no tenderness, and normal coordination (Tr. 632). He was discharged with instructions to follow up with endocrinology and neurosurgery. (Tr. 628).

Plaintiff followed-up with Dr. Turner a few days later, reporting double vision. (Tr. 559). On examination, his visual field appeared intact; his gait, reflexes, muscle strength, and sensation were normal. *Id.* Dr. Turner diagnosed diplopia and referred Plaintiff to neurosurgery and ophthalmology. (Tr. 560).

At a November 2016 consultative psychological examination, the examiner noted Plaintiff had good posture, a normal-appearing gait, and he was able to walk at a normal pace. (Tr. 523).

Plaintiff returned to the emergency room in December for abdominal pain and nausea. (Tr. 528-30). An abdominal/pelvic CT scan revealed possible pancreatitis, mesenteritis and duodenitis. (Tr. 533). It also showed multilevel degenerative changes in Plaintiff's spine, most pronounced at L4-L5 with a posterior disc bulge, facet hypertrophy, moderate narrowing of the spinal canal, and moderate narrowing of the neural foramen. (Tr. 532-33).

A few days later, Plaintiff saw ophthalmologist Lisa D. Lystad, M.D. (Tr. 662-67). He reported blurred vision, decreased vision, floaters, photophobia, tearing, and a gritty sensation. (Tr. 662). He reported a constant daily headache for the prior two to three months. *Id.* Dr. Lystad diagnosed monocular diplopia "[r]ight eye secondary to dry eye and refractive error". (Tr. 665). She gave Plaintiff eye drops and a prescription for glasses. *Id.* Dr. Lystad noted Plaintiff's ocular motility was full and he was "orthophoric in all gaze angles"; he had "difficulty with gaze holding in gaze extremes". *Id.* Finally, Dr. Lystad noted Plaintiff's visual field had "significantly improved since 2013", though he had "mild right inferior temporal defect". *Id.*

In January 2017, Plaintiff saw neurosurgeon Pablo Recinos, M.D. (Tr. 668-76). Plaintiff reported recurrent symptoms of double vision and headache for the prior five months. (Tr. 669). Plaintiff reported he worked as a general contractor, and lived alone. (Tr. 670). He was "[a]ctive at work, walk[ed], and stretche[d]." *Id.* On examination, Plaintiff had normal muscle strength, tone, and reflexes, and normal gait, including tandem gait. (Tr. 671). Dr. Recinos discussed three treatment options: observation, radiation treatment/radiosurgery, or surgery. (Tr. 668). At his return visit the following month, Plaintiff decided to proceed with observation, an approach Dr. Recinos described as "completely reasonable". (Tr. 684). His physical examination again revealed a normal gait, and full strength. (Tr. 685). Dr. Recinos instructed Plaintiff to return in November 2017 for an MRI and visual field tests. *Id.*

Plaintiff saw Dr. Turner for a physical in April 2017. (Tr. 696-99). He reported no joint or back pain, blurred vision, and occasional headaches. (Tr. 696). Dr. Turner's notes again state Plaintiff worked as a general contractor, and was "[a]ctive at work, walk[ed], and stretche[d]." (Tr. 698). His physical examination revealed no musculoskeletal tenderness, a normal gait, full muscle strength, and normal reflexes. *Id.*

5

Plaintiff went to the emergency room in June 2017 for low back pain. (Tr. 692). A provider prescribed medication and diagnosed sciatica. (Tr. 692-95). Plaintiff saw a nurse practitioner in Dr. Turner's practice the following day, reporting worsening back pain since slipping on stairs a week prior. (Tr. 708). Plaintiff reported the pain improved some, but he had difficulty sitting for lengthy periods and changing position. *Id.* The nurse practitioner noted a lumbar x-ray was "negative, degenerative". *Id.* On physical examination, Plaintiff had slightly decreased extension and flexion, mild pain to palpation in the lumbar spine midline, tenderness over the sacroiliac joint on the right, paraspinal muscle spasm, and loss of lumbar lordosis. (Tr. 709). He had an antalgic gait. *Id.* The nurse practitioner assessed bilateral low back pain with bilateral sciatica (Tr. 709); she instructed Plaintiff to use ice, moist heat, and medications prescribed by emergency room providers (Tr. 710). She noted that if symptoms persisted or worsened, she would consider physical therapy. *Id.*

Plaintiff returned to Dr. Turner three weeks later reporting back pain making him "very tired and dizzy". (Tr. 714). Stretching helped temporarily, but he had difficulty sitting up straight and pain radiated down both legs. *Id.* On examination, Plaintiff had tenderness to palpation in his lower thoracic and lower lumbar spine; he had a normal tandem gait, pain with toe walking, a positive straight leg raise test on the right, and full strength bilaterally. (Tr. 715). Dr. Turner noted Plaintiff had a physical therapy appointment the following day and that he would follow up with an MRI if Plaintiff had no improvement in four weeks. *Id.*

In late June, Plaintiff underwent a physical therapy evaluation with Miljan Cecez, P.T. (Tr. 725-31). He reported Naprosyn did not help, but muscle relaxers did. (Tr. 725). Sitting straight up was most uncomfortable; leaning to the side and supporting his arms helped. *Id.* Mr. Cecez observed Plaintiff moved from sitting to standing independently with difficulty, and walked

without an assistive device with an antalgic gait. (Tr. 727). His lumbar range of motion was reduced moderately in flexion, extension, and sideglide right; he had minimal limitation in rotation to the right or left, and a moderate to major limitation in sideglide left. *Id.* He had "5-" to 5 strength in his hip flexors, knees, and ankles. *Id.* His muscle tone was normal, and he had no balance difficulty. *Id.* Mr. Cecez stated Plaintiff "may benefit from skilled therapy services to improve pain, low back range of motion and overall function" and recommended two visits per week for four weeks. (Tr. 728).

Plaintiff returned to Dr. Recinos in July 2017. (Tr. 732-41). Plaintiff was "more open to surgery" since his tumor had grown, but wanted to discuss it with his significant other. (Tr. 732). On examination, Plaintiff had full motor strength and intact sensation. (Tr. 733). Dr. Recinos noted an MRI showed the tumor was "1mm away from the optic nerve but there [was] no definite compression of the nerve itself." (Tr. 734).

Plaintiff saw Laurence Kennedy, M.D., for a second opinion later that month. (Tr. 745). He reported dizziness, headache, and depression, but "[o]therwise he ha[d] no specific complaints". *Id.* Dr. Kennedy noted he "spent the greater part of this 45 minute consultation counseling Mr. Castro about the pituitary tumor" and "emphasized [his] view that he should undergo further surgery". (Tr. 746).

Plaintiff went to his second physical therapy visit in mid-July 2017 reporting pain in his left lower back, but resolution of his leg symptoms. (Tr. 742). He stated dizziness limited him more than his back pain. *Id.* On examination, the therapist observed a decreased arm swing on the right. *Id.* Plaintiff had moderate to major limitations in lumbar ranges of motion. (Tr. 743).

7

Plaintiff returned to Dr. Recinos in August 2017 accompanied by his significant other. (Tr. 750-57).[1] On examination, Plaintiff had full motor strength and sensation; he stood and ambulated independently with normal gait. (Tr. 750-51). Dr. Recinos again recommended surgery. (Tr. 753).

Plaintiff's surgery was scheduled for October 2017, *see* Tr. 760, and he underwent pre-surgery clearances including a nasal endoscopy, *see* Tr. 760-63. In September 2017, Plaintiff reported vision issues with bright light, but denied blurred or double vision. (Tr. 762). On examination at a pre-operative appointment, Plaintiff had normal motor skills. (Tr. 779).

Plaintiff had an upper respiratory infection in late September (Tr. 719-24), which postponed his surgery (Tr. 801). At an appointment in December with Dr. Recinos[2] to reschedule, Plaintiff reported continued headaches. (Tr. 801). Plaintiff reported having seen a headache neurologist[3] and Dr. Recinos recommended he make a follow-up appointment. *Id.* Plaintiff did not report joint pain or swelling, and on physical examination, he had normal muscle tone, full muscle strength, and a normal gait (including tandem gait). (Tr. 805).

On January 29, 2018, Dr. Recinos performed a surgical resection of Plaintiff's tumor. (Tr. 828-54). During his hospitalization, Plaintiff underwent a physical therapy evaluation. (Tr. 834-36). He presented with good overall strength, and was "near functional baseline" but "ha[d] 12 steps enter the home and will benefit from a PT session to focus on improving ambulation and stair training." (Tr. 834). Plaintiff was discharged on February 1, 2018. (Tr. 838-46). He was noted to have progressed satisfactorily through physical therapy until discharge (Tr. 839) and had full strength in his upper and lower extremities and a normal sensory examination (Tr. 844).

---

1. Plaintiff saw fellow Paramita Das, M.D., supervised by Dr. Recinos.
2. Plaintiff again saw fellow Paramita Das, M.D., supervised by Dr. Recinos at this visit.
3. Plaintiff saw Zubair Ahmed, M.D., in September 2017 (Tr. 799-800), but "had to leave the appointment" because he was unaware of the appointment's length (Tr. 794). Dr. Ahmed suggested he make a follow-up appointment to "at length discuss assessment and plan". *Id.*

In late March 2018, Plaintiff returned to see Dr. Kennedy. (Tr. 911). Dr. Kennedy noted he last saw Plaintiff earlier that month and had advised him to taper hydrocortisone; he ordered an ACTH stimulation test. *Id.* Plaintiff reported low energy, and a constant headache, and difficulty sleeping, but "[n]o real dizziness on standing". (Tr. 911-12).

*Opinion Evidence*

In February 2017, state agency physician Anton Freihofner, M.D., reviewed Plaintiff's medical records and opined Plaintiff could perform light work (meaning he could occasionally lift and carry 20 pounds, frequently lift and carry 10 pounds, and sit or stand/walk for about six hours each in an eight-hour day, *see* 20 C.F.R. § 416.967(b)); he could only occasionally climb ramps, stairs, ladders, ropes, or scaffolds, and could frequently stoop, kneel, crouch, or crawl. (Tr. 320-21). Dr. Freihofner noted Plaintiff complained of back pain and cited the CT scan showing degenerative changes, but stated Plaintiff had no treatment and an examination showed normal gait, good strength, full range of motion and normal sensation. (Tr. 321).

In March 2017, State agency physician James Cachillo, D.O., reviewed Plaintiff's records and offered an identical opinion. (Tr. 334-35).

In May 2018, Plaintiff underwent a functional evaluation with Mr. Cecez. (Tr. 930-41). In summary, Mr. Cecez opined Plaintiff: could perform sedentary work for "up to 7 hours and 32 minutes . . . per day while taking into the account his need to alternate sitting and standing"; could not sit for two hours at one time; could lift fifteen pounds and push/pull 20 pounds; could only occasionally bend, forward reach, perform fine and gross coordination, pinch, grasp, climb stairs, and walk; he should avoid static balance, crawling, firm grasping, sustained kneeling, and squatting. (Tr. 930). Within his analysis, Mr. Cecez noted Plaintiff could sit for five hours and 54 minutes (45 minutes at one time), and stand for two hours (20 minutes at one time). (Tr. 932). On

musculoskeletal testing, Plaintiff had some limited lumbar range of motion, and lower extremity manual muscle testing was "4+" to 5. (Tr. 935). Mr. Cecez noted full strength and normal range of motion in Plaintiff's fingers. (Tr. 936-37). His upper extremity strength was "5- " to 5. (Tr. 937). Mr. Cecez noted Plaintiff's score suggested "a positive Waddell Sign and the potential for unreliable pain reports during functional testing." (Tr. 938). Mr. Cecez also noted Plaintiff sat for a total of one hour and 20 minutes during the evaluation, and stood for 40 minutes (requiring a change of position after 20 minutes). (Tr. 941).

Based on this functional evaluation, Dr. Turner offered an opinion regarding Plaintiff's physical functioning. (Tr. 942-43). He opined Plaintiff could lift or carry 15 pounds occasionally and zero pounds frequently, stand or walk for two hours total in an eight-hour workday (20 minutes without interruption), and sit for slightly less than six hours in an eight-hour workday (45 minutes without interruption). (Tr. 942). He opined Plaintiff could rarely perform any postural activities (except he could occasionally climb) (Tr. 942), and occasionally perform reaching, pushing/pulling, and fine and gross manipulation (Tr. 943). He opined Plaintiff had environmental restrictions to heights, moving machinery, temperature extremes, pulmonary irritants, and noise. (Tr. 943). He noted a cane was prescribed and Plaintiff needed to alternate positions between sitting, standing, and walking at will. *Id.* Dr. Turner opined Plaintiff experienced moderate pain that would interfere with concentration, take Plaintiff off task, and cause absenteeism. *Id.* He further opined Plaintiff required two additional hours of rest time in an eight-hour workday. *Id.*

*Mental Health*

On a few occasions in 2015 and 2016, Plaintiff reported depression or depressive symptoms. *See* Tr. 464, 470, 544, 662.

10

In December 2016, Plaintiff underwent a consultative psychological evaluation with Jorethia Chuck, Ph.D. (Tr. 520-25). Plaintiff told Dr. Chuck he was "not sure why he [was] having a mental health evaluation." (Tr. 520). Plaintiff reported difficulty sleeping, feeling depressed, crying spells, easy agitation, and isolating himself from others. (Tr. 522). He performed personal care tasks, cooked in the microwave, and did laundry and household chores; he rode the bus to his appointment. *Id.* Dr. Chuck observed Plaintiff was pleasant, polite, and cooperative, with good eye contact and coherent and goal-directed thoughts. (Tr. 522-23). His affect "appeared tense" (though he relaxed as the interview progressed) and his mood "appeared depressed." (Tr. 523). Dr. Chuck diagnosed major depressive disorder, single episode, mild, and noted Plaintiff's prognosis was "poor without treatment." *Id.*

In 2017, Plaintiff was noted to have good memory, attention span, and concentration (Tr. 671, 804) and to be cooperative (Tr. 721, 726); he had a normal affect (Tr. 794).

In February 2017, Dr. Turner prescribed Plaintiff Trazodone to treat his depression and insomnia. (Tr. 583). He also referred Plaintiff for counseling. *Id.* A few days later, Plaintiff was referred to a social worker because results from a patient health questionnaire ("PHQ-9") indicated moderate depression. (Tr. 689).

In April 2017, Plaintiff reported he sometimes forgot to take his Trazodone. (Tr. 696). He was sleeping better, and still feeling somewhat depressed, but his "mood [was] better." *Id.* He also described his mood as "upset, angry, argumentative." *Id.* Dr. Turner continued Trazodone and prescribed Wellbutrin. (Tr. 699). In June, Dr. Turner continued these medications. (Tr. 715).

At an appointment with Dr. Recinos in July 2017, Plaintiff noted continued depression and related fatigue (Tr. 733); his PHQ-9 score indicated moderately severe depression (Tr. 739-40). Dr. Kennedy noted Plaintiff was "clearly anxious" at his surgery consultation. (Tr. 746).

11

In December, Plaintiff was referred to a social worker "given his positive depression score [and] history of anxiety". (Tr. 801). In March 2018, Plaintiff reported low energy, that headaches affected his mood, and difficulty sleeping. (Tr. 911-12). He was alert and oriented. (Tr. 912).

In other 2018 records, Plaintiff had an "okay" mood and normal affect (Tr. 839); "appropriate" mood and affect (Tr. 844); and "normal" mood, affect, and behavior (Tr. 863).

### Opinion Evidence

After the December 2016 consultative examination, Dr. Chuck offered an opinion regarding Plaintiff's mental functioning. (Tr. 524-25). She opined Plaintiff's cognitive functioning was in the low average range, and he would not have problems understanding, remembering, and carrying out instructions. (Tr. 524). She noted Plaintiff's depression would affect his ability to maintain attention and concentration, and he had short-term memory problems; she opined he would have difficulty with tasks requiring persistence and pace. *Id.* Dr. Chuck opined that Plaintiff would be able to respond appropriately to supervision (Tr. 524), but would have difficulty with co-workers, and his "adjustment levels [were] likely to deteriorate under the pressures of a normal work setting" (Tr. 525).

In January 2017, state agency reviewing psychologist Kristen Haskins, Psy.D., reviewed Plaintiff's records and opined Plaintiff would be moderately limited in his ability to maintain attention and concentration and moderately limited in his ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms. (Tr. 322-23) ("The claimant is capable of performing a wide array of short cycle tasks in an environment without fast pace demand[s]."). Dr. Haskins also opined Plaintiff would be moderately limited in his ability to interact with the public, supervisors, and coworkers, noting he should have "no more than superficial contact" with others. (Tr. 323). Finally, Dr. Haskins believed Plaintiff was moderately

limited in his ability to respond appropriately to changes in the work setting, stating that his ability would be "adequate to handle tasks without strict time limitations or production standards." *Id.* She further explained that she did not adopt the consultative examiner's findings because they "appear[ed] more restricting than the data of the exam would suggest". *Id.*

In March 2017, state agency reviewing psychologist Joseph Edwards, Ph.D., offered a similar opinion. (Tr. 335-37). His opinion was identical to that of Dr. Haskins except he found Plaintiff had fewer social limitations, noting he would not have difficulty with coworkers or supervisors. (Tr. 337) ("Can maintain occasional interactions with others."). He similarly declined to adopt the consultative examiner's findings. *Id.*

New Evidence Submitted to Appeals Council

Plaintiff presented additional evidence to the Appeals Council. *See* Tr. 10-127, 154-283.[4] This evidence included July 2018 ophthalmological examination with Dr. Lystad at which Plaintiff reported floaters, photophobia, and a foreign body sensation, but denied blurred or decreased vision. (Tr. 154). He reported that bright lights caused headaches. *Id.* On examination, Dr. Lystad noted that Plaintiff's visual fields were worse than in December 2016[5], but "not as bad as the initial fields in 2013"; Plaintiff's "[v]isual acuity remain[ed] 20/20 in both eyes." (Tr. 157).

Also in July 2018, Plaintiff saw Lilyana Angelov, M.D., for a neurosurgical evaluation and discussion regarding gamma knife radiosurgery. (Tr. 160-66). Dr. Angelov noted that "Dr. Recinos felt that there is some residual tumor present which was not safely resectable and that treatment with radiosurgery will be the next step for this." (Tr. 160). Plaintiff reported constant headaches,

---

4. The undersigned summarizes the records within this additional evidence to which Plaintiff specifically points. *See* Doc. 11, at 11.

5. As noted above, in December 2016, Dr. Lystad stated Plaintiff's visual field had "significantly improved since 2013" but there was "mild right inferior temporal defect." (Tr. 662).

worse with bright light, intermittent double-vision, dizzy spells, coordination difficulty, and memory changes. (Tr. 161). Dr. Angelov found Plaintiff had a normal gait as well as full motor strength and sensation. (Tr. 164). She reviewed a pituitary MRI (Tr. 164-65) and recommended gamma knife radiosurgery (Tr. 165). Radiation oncologist Samuel Chao, M.D.,[6] observed Plaintiff had intact and symmetric strength, intact sensation, normal reflexes, and an unsteady gait. (Tr. 176). He also had normal range of motion in his extremities and no bone or spine tenderness. *Id.* Dr. Chao recommended radiation therapy. (Tr. 177).

Plaintiff returned to the headache center in August 2018. (Tr. 181). His headaches worsened with stress and bright light, and improved with rest, medication, dark, and quiet. (Tr. 182). On examination, Plaintiff "[m]ade eye contact without apparent pain behavior", and had a normal, unassisted gait with normal stride length. (Tr. 183). A nurse practitioner prescribed Nortriptyline to take at bedtime. *Id.*

In September 2018, Plaintiff underwent five gamma knife stereotactic radiosurgery treatments. (Tr. 189-237). After these treatments, he was scheduled for an MRI to follow-up in three months. *See* Tr. 230, 236. At related appointments, Plaintiff consistently had a normal gait, intact coordination, and "4+" or greater muscle strength in all limbs. (Tr. 189-90, 203, 229).

VE Testimony

A VE appeared and testified at the hearing before the ALJ. (Tr. 303-07). The ALJ asked the VE to consider a hypothetical individual with Plaintiff's age, education, work experience, and residual functional capacity ("RFC") as ultimately determined by the ALJ. *See* Tr. 303. The VE responded that such an individual could perform work as a warehouse worker, cleaner, and kitchen helper. *Id.* The VE further testified that even if the hypothetical individual was limited to light

_____

6. Plaintiff saw resident physician Kailin Yang, M.D., Ph.D., supervised by Dr. Chao.

work with: occasional climbing of ramps, stairs, ladders, ropes, and scaffolds; frequent stooping kneeling, crouching and crawling; able to perform simple tasks and follow simple instructions; superficial and occasional interactions with coworkers and supervisors and occasional interaction with the general public, such an individual could perform work as a cleaner/housekeeper, cafeteria attendant, and assembler: plastic hospital products. *See* Tr. 303-04, 305-06. Further, the VE stated that if such a hypothetical worker required a cane for standing or to ambulate more than ten feet, or could only stand and walk no more than two hours in an eight-hour workday, jobs would be available. (Tr. 304, 307).

ALJ Decision

In his October 2018 written decision, the ALJ found Plaintiff had not engaged in substantial gainful activity since his SSI application date. (Tr. 138). He had severe impairments of lumbar spine disorder, residuals from pituitary adenoma, and depressive disorder (Tr. 138), but none of these impairments—singly or in combination—met or medically equaled the severity of a listed impairment (Tr. 139). The ALJ determined Plaintiff had the RFC to perform a full range of medium work except that he could "perform no more than simple tasks and follow no more than simple instructions". (Tr. 141). The ALJ then found that considering Plaintiff's age, education, work experience, and RFC, there were jobs that exist in significant numbers in the national economy that Plaintiff could perform. (Tr. 148). Therefore, he found Plaintiff not disabled. (Tr. 149).

STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence

is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The "threshold for such evidentiary sufficiency is not high." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 416.920—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

16

5.      Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. § 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

### DISCUSSION

Plaintiff raises two objections to the ALJ's decision. First, he contends the ALJ's RFC does not adequately account for the symptoms resulting from his severe impairments, including headaches, fatigue, depression, and dizziness. Second, he contends the ALJ erred in his evaluation of treating physician Dr. Turner's opinion (based on Mr. Cecez's functional evaluation). Finally, Plaintiff requests a Sentence Six remand for consideration of allegedly new and material evidence. For the reasons discussed below, the undersigned recommends the Court affirm the decision of the Commissioner and deny Plaintiff's request for a Sentence Six remand.

RFC

Plaintiff first argues the ALJ's failure to include certain limitations in the RFC lacks the support of substantial evidence. Specifically, he contends the RFC "does not adequately account for the limitations imposed by Mr. Castro's severe impairments, from headaches to a lack of energy to depression, and, therefore, cannot be said to have the support of substantial evidence." (Doc.

11, at 16). He does not point to any specific limitation the ALJ failed to include, but argues generally that the ALJ cherry-picked the record, and did not account for all of his symptoms.

A claimant's RFC is an assessment of "the most [he] can still do despite [his] limitations." 20 C.F.R. § 416.945(a)(1). "The responsibility for determining a claimant's residual functional capacity rests with the ALJ, not a physician." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) (citing 20 C.F.R. § 416.946(c)). An ALJ's RFC determination must be supported by evidence of record, but it need not correspond to, or even be based on, any specific medical opinion. *See Brown v. Comm'r of Soc. Sec.*, 602 F. App'x 328, 331 (6th Cir. 2015). Instead, it is the ALJ's duty to formulate a claimant's RFC based on all the relevant, credible evidence of record, medical and otherwise. *Justice v. Comm'r of Soc. Sec.*, 515 F. App'x 583, 587 (6th Cir. 2013). In formulating the RFC, an ALJ must consider all symptoms and the extent to which those symptoms are consistent with the objective medical evidence. 20 C.F.R. § 416.929. An ALJ must also consider and weigh medical opinions. 20 C.F.R. § 416.927.

The undersigned finds Plaintiff has not demonstrated reversible error in the ALJ's RFC determination and that determination is supported by substantial evidence. In considering symptoms, an ALJ follows a two-step process, prescribed by regulation. An ALJ must first determine whether there is an underlying medically determinable impairment that could reasonably be expected to produce the claimant's alleged symptoms; second, if such an impairment exists, the ALJ must evaluate the intensity, persistence, and limiting effects of those symptoms on the claimant's ability to do basic work activities. 20 C.F.R. § 416.929(a). In making this determination and considering whether a claimant has disabling pain, an ALJ must consider: 1) daily activities; 2) location, duration, frequency, and intensity of pain or symptoms; 3) precipitating and aggravating factors; 4) the type, dosage, effectiveness, and side effects of any

medication; 5) treatment, other than medication, to relieve pain; and 6) any other measures used to relieve pain. 20 C.F.R. § 416.929(c)(3); *see also* SSR 16-3p, 2017 WL5180304. "Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). The ALJ's subjective symptom evaluation determination "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Rogers*, 486 F.3d at 248.

The ALJ here followed this two-step process, first summarizing Plaintiff's symptoms (Tr. 142), and then, after review of the medical evidence of record (Tr. 142-45), explaining that he found Plaintiff's "statements about the intensity, persistence, and limiting effects of his symptoms . . . inconsistent because the evidence of record generally does not support the alleged loss of functioning." (Tr. 145). In so finding, the ALJ considered Plaintiff's daily activities, which included personal care, light household chores, using public transportation, walking for exercise, and working during the relevant period. *Id.* This is supported by the record. *See* Tr. 293-94 (testimony regarding walking to the store, cleaning bathroom sinks and mirrors); Tr. 522 (report that he could do personal chores, laundry, microwave meals, and take the bus); *see also* Tr. 577, 631, 670, 698, 742, 803 (2016 and 2017 notes regarding work as a "general contractor", being "active at work"). These records suggest greater physical and mental functioning than Plaintiff alleged. The ALJ also contrasted Plaintiff's allegations with his frequently normal or mild physical and mental examinations. (Tr. 142-47).[7] Such inconsistencies between subjective allegations and the objective record are a valid reason for discounting subjective symptoms. *Walters*, 127 F.3d at

---

7. The ALJ's supported reliance on Plaintiff's frequently normal or mild objective physical examinations is discussed in greater detail below.

531. This is not to say there is not contrary evidence in the record such as that to which Plaintiff points. But as the Supreme Court recently emphasized the substantial evidence "threshold for such evidentiary sufficiency is not high." *Biestek*, 139 S. Ct. at 1154. "It means—and means only— 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 217, 229 (1938)). Moreover, although he alleges that the ALJ failed to account for his symptoms and that the RFC is not restrictive enough in general, he does not specifically describe any functional limitation the ALJ should have included but did not.

The undersigned further rejects Plaintiff's contention that the ALJ cherry-picked the record. In fact, the ALJ's decision references many of the symptoms to which Plaintiff now points. S*ee* Tr. 142-46. The Sixth Circuit has consistently held that ALJs retain discretion to weigh conflicting record evidence. *See White v. Comm'r of Soc. Sec.* 572 F.3d 272, 284 (6th Cir. 2009) ("[W]e see little indication that the ALJ improperly cherry picked evidence; the same process can be described more neutrally as weighing the evidence"); *see also DeLong v. Comm'r of Soc. Sec.*, 748 F.3d 723, 726 (6th Cir. 2014) (an allegation that the ALJ unfairly "cherry-picked" the record "is seldom successful because crediting it would require a court to re-weigh record evidence."). The record reflects the ALJ did so here – weighing Plaintiff's subjective symptom complaints against other substantial evidence in the record. Thus, the ALJ finds Plaintiff has not established that the ALJ erred in failing to impose additional limitations due to complaints of fatigue, headaches, dizziness, vision problems, and depression.

20

Treating Physician Rule

Plaintiff next contends the ALJ erred in discounting Dr. Turner's opinion regarding Plaintiff's physical functioning (which was based upon Mr. Cecez's evaluation). The undersigned finds no error and recommends the Court affirm.

Generally, the medical opinions of treating physicians are afforded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188.[8] A treating physician's opinion is given "controlling weight" if it is supported by (1) medically acceptable clinical and laboratory diagnostic techniques; and (2) is not inconsistent with other substantial evidence in the case record. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). The requirement to give controlling weight to a treating source is presumptive; if the ALJ decides not to do so, he must provide evidentiary support for such a finding. *Id.* at 546; *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376-77 (6th Cir. 2013). When the physician's medical opinion is not granted controlling weight, the ALJ must give "good reasons" for the weight given to the opinion. *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)).

"Good reasons" are reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* (quoting SSR 96-2p, 1996 WL 374188, at *4). When determining weight and articulating good reasons, the ALJ "must apply certain factors" to the opinion. *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These

---

8. Although recent revisions to the CFR have changed the rules regarding evaluation of treating physician opinions, such changes apply to claims filed after March 27, 2017, and do not apply to claims filed prior to that date. *See* Social Sec. Admin., *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5852-53, 2017 WL 168819. Plaintiff filed his claim in January 2016 and thus the previous regulations apply.

21

factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.* While an ALJ is required to delineate good reasons, he is not required to enter into an "exhaustive factor-by-factor analysis" to satisfy the requirement. *See Francis v. Comm'r of Soc. Sec. Admin.*, 414 F. App'x 802, 804-05 (6th Cir. 2011).

An ALJ's brief explanation may satisfy the good reasons requirement, if that brief analysis touches on the required factors. *See Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009). However, a conclusory statement that a treating physician's opinion is inconsistent with the record is insufficient to satisfy the rule. *See Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010). "Put simply, it is not enough to dismiss a treating physician's opinion as 'incompatible' with other evidence of record; there must be some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick." *Id.* at 552.

The ALJ summarized Dr. Turner's opinion (based on Mr. Cecez's functional capacity assessment) and explained his reasons for the weight assigned:

> The undersigned assigns little weight to Dr. Cecez's and Dr. Turner's opinions. Dr. Cecez and Dr. Turner did not review all the records available at the hearing. Moreover, their opinions are internally inconsistent. For example, Dr. Cecez and Dr. Turner opined the claimant could perform no more than sedentary work, but also noted that he demonstrated normal gait, mostly normal strength in his bilateral upper and lower extremities, and [a] positive Waddell's sign, which is indicative of unreliable pain reports during functional testing (Exhibit 14F/5-13). As discussed above, the claimant mostly demonstrated normal gait, normal tandem gait, normal range of motion throughout, 5/5 strength in upper and lower extremities, normal muscle tone, normal coordination, normal reflexes, intact sensation, intact cranial nerves, and no evidence of scoliosis, edema, joint swelling, tenderness, cyanosis, erythema, clonus, clubbing, Hoffman's sign, or Romberg's sign during objective physical status exams (Exhibits 2F; 4F/16, 5F/79-83, 95-96; 7F/1-4, 19-20; 8F/26-

29, 77-81; 10F/15-20, 25-26, 31-32; 14F/5-13). Thus, the undersigned finds the claimant can perform medium work.

(Tr. 146). The undersigned finds that the reasons provided are both supported by substantial evidence, and satisfy the "good reasons" rule.

The ALJ explained that Dr. Turner and Mr. Cecez did not have the full record to review. It is an ALJ's duty to formulates the RFC based on the record as a whole. *See Justice*, 515 F. App'x at 587; *see also Poe*, 342 F. App'x at 157 ("The responsibility for determining a claimant's residual functional capacity rests with the ALJ, not a physician.").

Next, the ALJ explained that he found the opinion "internally inconsistent." (Tr. 146). Specifically, he reasonably explained that he found the opinion's statement that Plaintiff could do only sedentary work inconsistent with normal findings from the examination on which it was based such as a normal gait (*see* Tr. 939), relatively normal strength (*see* Tr. 935-37), and a positive Waddell's sign (*see* Tr. 938). *Id.* Internal inconsistency is a valid reason to discount a treating physician opinion. *See Ledford v. Astrue*, 311 F. App'x 746, 754 (6th Cir. 2008); *Bernola v. Comm'r of Soc. Sec.*, 127 F. Supp. 3d 857, 863 (N.D. Ohio 2015). And the ALJ's finding is supported. Although Mr. Cecez's evaluation certainly found Plaintiff had some limitations, it was a reasonable reading for the ALJ to find that Dr. Turner's opinion based thereon was more extreme than supported by the objective findings therein. This speaks to the regulatory factor of the "supportability" of the opinion. *See* 20 C.F.R. § 416.927(c)(3) ("The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion." ).

Further, the ALJ explained that the opinion was inconsistent with the record as a whole. This speaks to the regulatory factor of "consistency". *See* 20 C.F.R. § 416.927(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give

to that medical opinion."). Plaintiff seemingly argues that the ALJ focused on the evidence that supported his ultimate conclusion, while ignoring the evidence that detracted therefrom. But the ALJ's rationale – that Plaintiff had frequently normal or mild physical findings throughout his treatment, is supported by substantial evidence in the record. *See* Tr. 546 (normal gait, normal muscle strength, no musculoskeletal tenderness, normal range of motion); Tr. 459 (normal musculoskeletal examination); Tr. 625 (independent ambulation), Tr. 632 (normal range of motion, no tenderness, normal coordination); Tr. 559 (normal gait, reflexes, muscle strength); Tr. 523 (normal gait and normal walking pace); Tr. 671 (normal gait, muscle strength, and tone); Tr. 685 (normal gait and full strength); Tr. 698 (normal gait, full muscle strength, no musculoskeletal tenderness); Tr. 805 (normal gait, muscle tone, and full muscle strength); Tr. 844 (normal lower extremity strength); Tr. 750 (full motor strength, normal gait); Tr. 799 (normal motor skills). Although Plaintiff can point to evidence suggesting a contrary conclusion, this Court must affirm "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477. Plaintiff first points to the abdominal/pelvic CT scan from December 2016 which showed degenerative spinal changes. *Id.* (citing Tr. 531-33). But "[t]he mere diagnosis of [a condition]. . . says nothing about the severity of the condition." *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988); *see also Hill v. Comm'r of Soc. Sec.*, 560 F. App'x 547, 551 (6th Cir. 2014) ("[D]isability is determined by the functional limitations imposed by a condition, not the mere diagnosis of it."). Plaintiff also accurately points to some positive findings in the record, including an antalgic gait, positive straight leg raising, painful toe walking, and limitations in lumbar ranges of motion (Doc. 11, at 18) (citing Tr. 709, 714-15, 727, 742-43). But again, the standard of review this Court applies is substantial evidence, defined as "more than a scintilla . . . but less than a preponderance" and as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Besaw*, 966 F.2d at 1030. Moreover, the positive physical findings to which Plaintiff points come largely from a two-month period – June to July 2017. Plaintiff had normal findings, both before (*see* Tr. 458-59, 523, 546, 559, 671, 685, 698) and after (*see* Tr. 733 (full motor strength); 805 (normal muscle tone, full muscle strength, normal gait)) this period. Finally, even where the evidence can support two contrary conclusions, the undersigned must affirm the decision of the Commissioner. *See Wines v. Comm'r of Soc. Sec.*, 268 F. Supp. 2d 954, 960 (N.D. Ohio 2003) ("Of course, when a record presents substantial evidence supporting two contrary conclusions, a reviewing court must affirm the finding of the Commissioner.").

Taken together, the undersigned finds the ALJ provided substantially supported good reasons, that is, reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight", SSR 96-2p, 1996 WL 374188, at *4 – addressing on the regulatory factors of supportability and consistency – for discounting Dr. Turner's opinion.

Sentence Six

Finally, Plaintiff argues he is entitled to a "Sentence Six" remand. *See* 42 U.S.C. § 405(g) ("The court . . . may at any time order additional evidence to be taken before the Commissioner . . . but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding[.]" ).

To obtain a remand, thus, the claimant bears the burden of demonstrating the evidence is "new," "material," and that he had "good cause" for failure to present it at the hearing. *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 276 (6th Cir. 2010). Evidence is "new" if it was not in existence or available to the claimant at the time of the administrative proceeding. *Sullivan v. Finkelstein*, 496 U.S. 617, 626 (1990). Evidence is "material" if "there was a reasonable

probability that the [Commissioner] would have reached a different disposition of the disability claim if presented with the new evidence." *Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 711 (6th Cir. 1988). To be "material", evidence must show a "marked departure from previous examinations." *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993). To show "good cause," a claimant must "demonstrat[e] a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ." *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001).

Although acknowledging that the evidence is "arguably" new, the Commissioner disputes materiality, arguing that the records "show only continuing treatment, and do not show that Plaintiff's condition changed in any material way." (Doc. 14, at 15-16). The undersigned agrees.

First, Plaintiff submitted this evidence to the Appeals Council, which considered it and found it "[did] not show a reasonable probability that it would change the outcome of the decision." (Tr. 2). *See Blankenship v. Comm'r of Soc. Sec.*, 624 F. App'x 419, 431 (6th Cir. 2015) ("[T]he Appeals Council has already considered the records contained in Exhibit B7F in affirming ALJ Dowd's decision. . . . Accordingly, there is no reason to think that remanding this matter for further administrative proceedings would result in a different outcome.").

Second, the new evidence primarily shows ongoing treatment for Plaintiff's condition (*see* Tr. 189-237), and similar ongoing symptom reports, *see* Tr. 161 (reporting headaches, worse with bright light, memory changes, dizziness, and intermittent double vision); Tr. 181 (reporting worsening headaches); *see also* Tr. 156-57 (noting visual fields "worse than when seen in Dec. 2016" but "not as bad as the initial fields in 2013" and that "[v]isual acuity remains 20/20 in both eyes."). The undersigned finds that Plaintiff has failed to show "there was a reasonable probability

that the [Commissioner] would have reached a different disposition of the disability claim if presented with the new evidence." *Sizemore*, 865 F.2d at 711.

Third, while Plaintiff points to one record in the new evidence demonstrating he had an unsteady gait (Tr. 176), the Commissioner correctly points out that his gait was normal in numerous other visits within these new records (Tr. 164, 183, 190, 203, 229, 241). As such, the undersigned finds Plaintiff has failed to demonstrate such a record would have resulted in a different outcome.

For these reasons, the undersigned recommends the Court deny Plaintiff's request for a Sentence Six remand.

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying SSI supported by substantial evidence and recommends the decision be affirmed.

 s/James R. Knepp II
United States Magistrate Judge

*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).